JOHN CLARKE ESTATE v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, Second Department.   February 5, 1915.)

1. DEEDS (§ 111*)—DESCRIPTION—CONFLICTING ELEMENTS—PARTICULAR AND GENERAL DESCRIPTION.

   Where a grant described generally a certain piece of land of a specified area between four straight lines, each of a specified length, followed by a particular description of the lines, the particular must control, if there is a discrepancy between the two.

   [Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 309–315, 334, 335; Dec. Dig. § 111.*]

2. NAVIGABLE WATERS (§ 37*)—DESCRIPTION—SEASHORE.

   Under the common law, a tract of land bounded by a line running from the mouth of a creek southeasterly along the seashore does not extend beyond high-water line.

   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

3. EVIDENCE (§ 81*)—PRESUMPTIONS—FOREIGN LAW.

   Where a grant was made under the law of New Netherlands, but there was no evidence that under that law it would include lands under water, it will not be presumed that it did.

   [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 102; Dec. Dig. § 81.*]

4. INDIANS (§ 10*)—LANDS—TITLE.

   The Indians in 1666 had no title to land which they could grant, and which would be recognized in the courts.

   [Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 25, 29, 46; Dec. Dig. § 10.*]

5. NAVIGABLE WATERS (§ 37*)—DESCRIPTION—WATER COURSES—NAVIGABLE BAY.

   A grant which conveyed land bounded by a creek side did not include land below high-water mark, where the so-called creek was in fact a navigable tidewater bay.

   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

6. NAVIGABLE WATERS (§ 37*)—LAND UNDER WATER—CONSTRUCTION OF PATENT.

   The fact that the patent to the town of Flushing referred to the westerly boundary as being the land granted to Newtown, and that the land conveyed in the two patents was separated by Flushing Bay, does not establish that the Newtown patent included the land under the water of the bay.

   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

7. NAVIGABLE WATERS (§ 37*)—LAND UNDER WATER—CONSTRUCTION OF PATENT.

   The patent granted to Newtown by the Governor General under the Duke of York in 1666, in which the land was described as bounded on the east by Flushing creek, and on the north by the Sound, and that by the Governor of New York in 1686, in which the land was bounded on the east by Flushing creek, both of which patents were intended to confirm the title to lands previously granted, conveyed no rights in the land below high-water mark, in Flushing Bay, which was included in the designation of Flushing creek in those patents.

   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. NAVIGABLE WATERS (§ 37*)—LAND UNDER WATER—CONSTRUCTION OF PATENTS.

Where a city had made no previous claim that ancient conveyances to its predecessor conveyed the title to lands under the water of a bay, though the state had made several grants of portions of such land, giving the city or its predecessor notice of the application therefor, the construction thus placed on the grants by the acts of the grantee will be followed, if the language is ambiguous.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

Appeal from Trial Term, Queens County.

Action by the John Clarke Estate against the City of New York. Judgment for defendant, and plaintiff appeals. Reversed, and new trial granted.

Argued before JENKS, P. J., and BURR, CARR, STAPLETON, and PUTNAM, JJ.

Herman Aaron, of New York City (Charles Adkins Baker, of New York City, on the brief), for appellant.

Clarence L. Barber, of New York City (Terence Farley, of New York City, on the brief), for respondent.

BURR, J. Plaintiff, in possession of certain land originally below high-water mark in Flushing Bay, brings this action against the city of New York as successor to the town of Newtown. Laws 1897, c. 378, §§ 1, 8. It alleges that defendant unjustly claims an interest in said land and seeks to quiet its own title thereto. On September 30, 1897, the commissioners of the land office of the state of New York adopted a resolution to the effect that about 20½ acres of land lying between uplands fronting on Flushing Bay, then belonging to John Clarke, plaintiff's predecessor in title, and the pier headline as established by law, and under the waters of said bay, should be granted to said Clarke. On August 27, 1898, letters patent were issued under the great seal of the state, purporting to grant said land to him, and subsequently thereto the same has been substantially improved by the driving of spiles, the construction of cribwork, and the erection of a dock thereon. The parties stipulated that Flushing Bay was a tidewater bay. There is no dispute that the locus in quo is within the bounds of Clarke's patent. Defendant's counsel concedes that plaintiff's title to the land in question is valid, provided that at the date of said grant the state had title to the lands therein described. But it contends that by earlier and colonial charters such land was granted to the town of Newtown, to whose rights it has succeeded. As this question is answered, this action must be determined.

Defendant has offered in evidence, as sources or muniments of its title, first, a patent dated in 1645, purporting to be made by Willem Kieft, Director General, and Council of New Netherlands, to "Francis Doughty, and companions, their heirs and assigns"; second, an instrument, dated in July, 1666, executed by Rowerowestco and Pomwaukon, acting in behalf of the Indian occupants of the land therein described, purporting to alien the same to the inhabitants of Newtown, alias Mid-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

dleburg; third, letters patent, under date of March 6, 1666, by Richard Nicoll, Esq., Governor General under his royal highness James, Duke of York and Albany, ratifying, confirming, and granting to certain persons named therein as patentees the lands therein described; and, fourth, letters patent, dated November 25, 1686, by Thomas Dongan, Captain General, Governor, and Vice Admiral of New York and its dependencies, under his majesty, James the Second, confirming the previous grants.

The first of these instruments in point of time is that purporting to be executed by Willem Kieft. As a foundation for defendant's title, this is a most unsatisfactory instrument. It appears to be unsigned and undated. It is in the Latin tongue, and the parties do not agree as to the correct translation thereof. There is neither proof nor conclusive stipulation with respect thereto. There is no evidence in this case as to the nature or character of the claims of the Dutch government to the lands under water and below high-water mark in New Netherlands. It may be that for the purposes of this case the stipulation of the parties that the States General of the United Netherlands granted a charter to the Incorporated West India Company and approved a set of rules and regulations of said company, which authorized its representatives or Directors General to make grants of land in New Netherlands to private individuals and corporations, and the further stipulation that Willem Kieft was duly authorized and commissioned as Director of New Netherlands to make grants of land, would be sufficient to sustain a grant of upland. This was land under water. The grant is in its terms to "Francis Doughty, and companions, their heirs and assigns, and heirs in real, actual, and perpetual possession." There is nothing in the patent or in contemporaneous writings, nor in the evidence in this case, to indicate whether this grant was to them in any corporate capacity, or otherwise than as tenants in common.

[1] As defendant claims only as successor of the town of Newtown, unless the grant was to the town, defendant's title is not strengthened thereby. But if we assume Kieft's jurisdiction and authority, and if we assume that the translation of the patent offered by defendant is correct, and if we treat the grant to Doughty and his associates as one for the common good of the inhabitants of this part of Long Island, we do not think that the bounds thereof include therein the land in question. It describes generally—

"a certain piece of land, with pastures and whatever else it includes, * * * containing six thousand six hundred and sixty-six acres, Holland measure, or thereabouts, geographically, inclosed between four straight lines, each two thousand Dutch perches long."

This general description is followed by a particular one. If there is discrepancy between these, the words of the particular description must prevail. Tiedeman on Real Property, § 829; Burnett v. Wadsworth, 57 N. Y. 634; Parsons v. Johnson, 68 N. Y. 62, 23 Am. Rep. 149.

[2] The first course in the particular description—

"begins at the east corner of Hans Hansen's meadow dividing by the course of the creek the marsh into two equal parts and extends to the plantation

of Richard Brudnall and thence northeast, passing *through the middle of the village marsh to the small creek shoring the southern part of Henry Agricola's (Henry the farmer's) land, then following it to its mouth."*

The second line is as follows:

"Beginning here bends towards the southeast *following the seashore* to another small creek."

This is probably the creek now known as Flushing creek. The description continues:

"Then along the course thereof from its mouth to where you come to the eastern extremity of the same marsh (where the same creek rises)."

The remaining courses are wholly inland. It is apparent that the northerly boundary of this grant, for some considerable distance, lies to the south of the shore front on the East River or the Sound. It lies to the south of the small creek which is the southerly boundary of Henry Agricola's farm. When, following the course of this creek, it finally reaches the shore at the mouth thereof, it then proceeds in a southeasterly direction "following the seashore." It is this boundary, if any, which would include plaintiff's land. The parties to this action have properly stipulated that between the northerly boundary of the land described in the Kieft patent and the Sound were certain other lands which had been granted to private individuals, and also certain ungranted lands, "all of which were generally referred to in colonial times as the 'Outlying Plantations.'" There was also received in evidence, without objection, from the town records of Newtown, between 1700 and 1714, an account of an unsuccessful effort upon the part of the owners of these outlying plantations to participate in the benefits of the common lands included in this and the subsequent patents to Newtown.

[3] Under the common law of England, as adopted in this country, a grant beginning at a point on the shore of tidal navigable water, and following the "seashore," would not extend beyond high-water line (People ex rel. Underhill v. Saxton, 15 App. Div. 263, 44 N. Y. Supp. 211, affirmed 154 N. Y. 748, 49 N. E. 1102; Sage v. Mayor, 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592), and no presumption to the contrary will be indulged in (Palmer v. Hicks, 6 Johns. 133; Mayor, etc., of City of N. Y. v. Hart, 95 N. Y. 443; De Lancey v. Piepgras, 138 N. Y. 26, 33 N. E. 822). In the absence of evidence that, under the law of the United Netherlands as adopted in the New Netherlands such a grant would include lands under water, we are not justified in indulging in such a presumption.

[4] So far as the instrument executed by the Indian sachems is concerned, it may suffice to say that:

"The Indians had no title which they could grant and which would be recognized in the courts of this country." Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1, 22 N. E. 387.

[5] If, however, we turn to the language of this instrument as a possible aid to the construction of subsequent patents, we find that the line there runs northeastward to a certain creek called—

"Sackhickneyah, where Wessel's mill stood; so bounded by the bay side till it come to the mouth of Flushing creek, so commonly called; so running

towards the southeast *bounded by the creek side*, till it extends itself to the south side of the hills upon the line."

It is not entirely clear whether this instrument makes a distinction between Flushing Bay and Flushing creek as we now know them, or whether the words "so bounded by the bay side" do not refer to the body of water sometimes spoken of as the East River and sometimes as the Sound. If we assume that the entire body of water, a portion of which is now known as Flushing Bay, and the stream running into it, now known as Flushing creek, was at that time known as Flushing creek, still the boundary line of the grant, treating it as such, at least in front of the property in question, is high-water line upon the shore of the upland washed by what is known as Flushing Bay. That it may have been termed a creek, when in fact it was a tidal bay, navigable in character, could not so alter the rule of law that the limit of the grant would be the center line of what is called the creek, rather than high-water mark upon the shore of this tidal bay.

[6] There is some authority for the conclusion that there was no distinction between the creek and the bay, if we examine the patent granted in October, 1645, to the town of Flushing, which is immediately adjoining upon the east. It grants a tract of land whose bounds westward begin "at the mouth of a creek upon ye East River, now commonly called and known by the name of Flushing creek, and so to run eastward as farr as Mathew Garretson's bay," etc., and in this patent it speaks of the westerly boundary line as being "the land granted to Mr. Francis Doughty and associates." The Kieft patent, under which defendant claims, is the only one to which this reference could apply; but, inasmuch as this patent did not in express words include the land under water either of Flushing Bay or Flushing creek, we would not be justified in assuming that by this reference it was intended that the said land under water should be included therein. It may be that there is an indefiniteness of description as to the whole of the westerly boundary line of the land granted to the town of Flushing. But if it should be deemed necessary to make the westerly boundary line the land granted to Doughty and his companions, it would be more reasonable to say that the whole of the land under water of Flushing Bay and Flushing creek to the high-water mark on the westerly side thereof was conveyed to Flushing than that any portion of it was conveyed to the Town of Newtown. It is impossible from the evidence in this case to determine which was the prior patent, although the reference in the Flushing patent to Doughty and his associates would indicate that the Newtown patent was prior in point of time. But, whichever construction we adopt as to the meaning of the grant to the town of Newtown, the exterior line thereof is high-water line on the shore of the body of water known either as Flushing Bay or Flushing creek.

If we pass next to the Nicoll patent, it appears by the recitals therein that its purpose was "for a confirmation unto the said freeholders and inhabitants in their enjoyment and possession of the premises" of which they had "heretofore made lawful purchase." If Flushing creek, as the word is employed in the instrument executed by the sachems in

July, 1666, includes therein Flushing Bay, it is natural that in the Nicoll patent, in March of the same year, the words should be employed with a similar meaning. The Nicoll patent bounds the land granted on the "east by Flushing creek; north by the Sound." There is no distinction therein between the creek and the bay. If we, then, construe the words "Flushing creek" as comprising the entire body of water on the east and northeast side of the upland, no portion of the land in question was included therein.

[7] The words in the Dongan patent of 1686, that the land was bounded on "the east by Flushing creek and a line to be drawn from the head thereof due south, extending to the south side of the hills" and "on the north by the Sound," can only under the circumstances permit a similar construction. Thus construed, we have a fixed and definite boundary line, to wit, high-water mark on the easterly and northeasterly line of the land granted for its entire distance, and until the course of the boundary is changed by an east and west line running along the Sound to the north of the upland. Otherwise construed, we are left without definite information as to where Flushing creek ends, where Flushing Bay begins, where it terminates, and whether, if the east line is projected north, it is a projection of the east, west, or center line of Flushing creek proper. If the southerly extremity of the pier line, established by law as shown by the map in evidence, might be considered to be where Flushing creek ends and Flushing Bay begins, a projection of either of these lines in a direct course would exclude from the territory of Newtown a large portion of upland between such line so projected and the shore of the Sound. Such a construction is neither justified nor permissible.

[8] But there are other difficulties in the way of defendant's contention. The learned corporation counsel contends that, if the premises in question were included in the town grants, mere inaction upon the part of the former town officials would not operate, either by way of estoppel or waiver, to prevent the city from asserting its present claims. Perhaps not. But see Trustees, etc., v. Smith, 118 N. Y. 634, 23 N. E. 1002, 7 L. R. A. 755. But certainly—

"when a grant of remote antiquity contains general words the best exposition of such a grant is long usage under it." Trustees of Brookhaven v. Strong, 60 N. Y. 56, 72.

Beginning with 1833, we find various legislative acts either inconsistent with the claim of Newtown to ownership of lands under water in Flushing Bay, or wholly unnecessary if such claim was well founded. Laws 1833, c. 41; Laws 1833, c. 140; Laws 1835, c. 146; Laws 1848, c. 211; Laws 1849, c. 127; Laws 1884, c. 375; Laws 1885, c. 469; Laws 1913, c. 62.

We find that, beginning with the year 1853 and extending down to December, 1897, applications were made in 13 separate instances to the commissioners of the land office for grants of land under the waters of Flushing Bay, and that these applications were subsequently granted. In most instances notice of the application was served upon the town clerk of the town of Newtown, and in many instances the town officers actively participated in procuring the grants sought for.

After consolidation of the town of Newtown and the former city of New York, and in 1902, another application was made by the owners of abutting upland for a grant of land under the waters of Flushing Bay. Notice of such application was given to the mayor of the city and the commissioner of docks. The corporation counsel, appearing for the city, requested that in the grant to be made two provisos should be inserted; the first excepting "the right, title and interest of the City of New York in the lands under water in front of projected streets" (see Laws 1901, c. 466, § 83), and the second to the effect that the "city of New York may at any time hereafter acquire title to the premises herein granted upon payment to the patentee, his heirs, successors, and assigns, the amount paid by such patentee to the state for said premises, together with the value of the improvement thereon." Beyond this no objection was made to the granting of the patent. These suggestions were acted upon, and both of these clauses were inserted in the patent as issued.

The position then taken by the city of New York is hardly consistent with its present claim of absolute ownership of the entire land included therein. Following the issuing of these various patents, in some instances the grantees named therein constructed valuable improvements upon the lands so granted. Conduct similar to that of the city in this particular case, if the parties to the transaction were both individuals and neither was a municipal corporation, would scarcely be deemed ethical. It seems to us that this is pre-eminently a case where, if the language of the grants to the town is ambiguous, the rule of practical construction should be followed (Town of Southampton v. Mecox Oyster Bay Co., supra), and the city should be deemed to have no interest in the lands which are the subject-matter of this controversy. The request of plaintiff, that a verdict be directed in its favor, should have been granted, and it was error to direct a verdict for defendant.

The judgment and order appealed from should be reversed, and a new trial granted; costs to abide event. All concur.