(15 App. Div. 263.)

PEOPLE ex rel. UNDERHILL v. SAXTON et al.

In re DANA. In re DURYEA. In re LADEW. In re NORTH COUNTRY CO.

(Supreme Court, Appellate Division, Third Department. March 3, 1897.)

1. PUBLIC LANDS—APPLICATION FOR GRANT—REFERENCE TO COMMITTEE BY LAND COMMISSIONERS.

An application for a grant of land under water may be referred for hearing by the commissioners of the land office to a committee, under Laws 1894, c. 317 (Public Lands Law) § 9, which provides that the commissioners may summarily inquire into the rights of a person applying for a grant, and that they may establish reasonable rules for such purposes as they may deem proper.

2. SAME—OBJECTIONS TO REFERENCE—HOW MADE.

An objection that the commissioners of the land office have no power to refer an application for a land grant to a committee for hearing should be made before the commissioners, and it is not sufficient to make it before the committee alone.

3. SAME—HEARING—PROCEDURE.

In proceedings before a committee of the land office it is not important which side first presents its proofs, so long as full opportunity is given to all to present all the proofs they desire.

4. SAME—GENERAL AND PARTICULAR DESCRIPTION—INCONSISTENCY.

A patent to a town, which contains a general description of the land conveyed as bounded "on the west by the bounds of Hempstead," a town lying on the west side of a harbor, and a particular description of the westerly boundary as running "on the east side" of the harbor, does not include the harbor, since the general description must yield to the particular one.

5. TOWNS—TITLE TO LAND—BOUNDARIES FIXED BY COUNTY SUPERVISORS.

The ownership of land is not affected by the action of the board of county supervisors in fixing a boundary line of the town.

6. PUBLIC LANDS—PRESUMPTION OF STATE OWNERSHIP.

The commissioners of the land office may act on the presumption that lands under tide water belong to the state, where there is no proof to the contrary.

7. SAME—DISCRETION OF COMMISSIONERS.

A determination by the commissioners of the land office of the question whether public interest requires the denial of an application for a grant of land under water is a matter of discretion, under Laws 1894, c. 317, § 70, as amended by Laws 1895, c. 208, authorizing the commissioners to make such grants to promote the commerce of the state, or for the purpose of beneficial enjoyment of adjacent lands, or for agricultural purposes.

8. SAME—RULES OF LAND OFFICE—WAIVER BY COMMISSIONERS.

The commissioners of the land office may, in any proceeding, waive or modify rules of their own adoption, where no statute is involved, and they act in good faith.

9. SAME—SHORES OF NAVIGABLE WATERS.

The rule that the state can alienate its title to seacoast and shores of tidal rivers only for public purposes and benefits is subject to the exception that grants may be made to owners of adjacent uplands for their beneficial enjoyment or for commercial purposes.

Certiorari by Samuel J. Underhill, individually and as supervisor of the town of Oyster Bay, to review the action of Charles T. Saxton and others as commissioners of the land office of the state of New

York in allowing the application of Charles A. Dana for a grant of 9.27 acres of land under waters of Long Island Sound, in front of and adjacent to uplands of said Dana in the town of Oyster Bay, Queens county. Affirmed.

Three other similar applications were made at the same time to the commissioners, —one of Lewis T. Duryea and another for 6.49 acres, one of Louise B. W. Ladew for 28.575 acres, and one of the North Country Company for 8.04 acres,—and all were heard together, the same proofs being used in all the cases. All the applications were granted. Separate certioraris were obtained in each, but were all submitted together in this court.

Argued before PARKER, P. J., and LANDON, HERRICK, PUT-NAM, and MERWIN, JJ.

Edward Cromwell and Thomas Young, for relator.
T. E. Hancock, Atty. Gen., for commissioners of land office.
Franklin Bartlett, for Charles A. Dana.
Wilmot T. Cox, for North Country Company.

MERWIN, J. The main questions in the four cases submitted are the same, and the cases may therefore be considered together. The applications were presented to the commissioners on March 16, 1896, and, as stated in the returns, were substantially as required by the rules of the commissioners. Each application was accompanied by two maps, showing the uplands of the respective applicants, the land under water applied for, and the shore lines adjacent thereto. Notice of each application was published and posted as required by section 71 of chapter 317 of the Laws of 1894, being the public lands law. The notice stated that any person deeming himself liable to injury by the grant desired should file with the commissioners a remonstrance, stating his reasons for opposing the grant. Thereupon a remonstrance was filed on behalf of the town of Oyster Bay, in which it was claimed that the town was the owner of the premises applied for. A remonstrance was also filed, purporting to be signed by a large number of residents and taxpayers of the town, opposing the applications upon the ground that the granting of them would seriously interfere with the occupation of many people as baymen; and that the premises, if not belonging to the town, belonged to the state in trust for all its inhabitants, and were not needed by the applicants to promote commerce, or for the purpose of beneficial enjoyment by the adjoining owners. An affidavit was also filed, made by the supervisor of the town and several other town officers, stating that they did not believe it to be necessary, for the full beneficial enjoyment of the lands applied for, that the applicants should be granted an estate in fee. In accordance with the standing resolution of the commissioners, the applications were referred to the standing committee on hearing the remonstrances, such committee consisting of the attorney general and the state engineer, and the state treasurer was by resolution added to the committee. The committee were directed to hear the parties in interest, and report to the board. After due notice, a hearing was had on the 26th April, 1896, at the office of the attorney general, before the state engineer, the state treasurer, and Mr. Baker, land clerk,

representing the attorney general by his direction. The remonstrants, at the commencement of the hearing, objected to the hearing before a committee, and claimed that it should be before the full board, or a legal quorum thereof. This objection was overruled by the committee, and the hearing proceeded. This ruling is claimed to be error. Had the attorney general been present, there would have been a legal quorum of the board. Section 2, c. 317, Laws 1894. In his absence, a majority, and therefore a quorum, of the committee was present. No objection was made to the presence of Mr. Baker, or to his acting with the committee. He was there apparently as their legal adviser. He was not, however, a member of the committee. A majority of the committee being present, they had a right to act on the subject referred, so that the only question on this subject is whether the board had a right to make the reference to the committee. It was in accordance with their practice in such cases. By section 9 of the act above referred to it is provided as follows:

"Sec. 9. Before granting any lands or any interest therein, including lands under water, the commissioners may summarily inquire into the rights of the person applying for such grant, on such proof as, by regulation, they prescribe. They may take testimony and proofs in any matter or application before them, and the fees of witnesses and the expenses of procuring their attendance, on being certified by the commissioners, shall be paid by the treasurer on the warrant of the comptroller. They shall establish reasonable rules to guard against false or fraudulent applications and for such other purposes as they may deem proper."

Under this the commissioners had the right to summarily inquire into the rights of the applicants on such proof as by regulation they might prescribe. This would seem broad enough to cover the whole proceeding. The statute makes no special provision for the manner in which remonstrances shall be heard or considered. The parties were given a full and free hearing before the committee. The proofs taken by the committee were reported to the board, and, as the commissioners certify, opportunity was given for a further hearing before the commission in regular meeting assembled. The objection, when taken before the committee, was treated as formal, as from its character it naturally would be. The board itself was the proper body to consider an objection of that kind. It does not appear to have been raised before the board, although there was opportunity for doing so. It does not, I think, furnish any good ground for reversal. See People v. Board of Police Com'rs, 93 N. Y. 97, 103.

A point is made as to another objection taken by the remonstrants at the same stage of the case,—that the affirmative was upon the applicants, and they should be required to give their proof first. The committee were directed to hear the parties in interest, and report to the board. The papers already filed with the board by either side were apparently before the committee. The duty of the committee was to take such proof as any party might present. It was not important which side presented its proof first, as long as full opportunity was given to all to present all the proof they desired. The decision of the case was not with the committee, but with the board. It is not apparent that in the ruling referred to any rule of law affecting the rights of the parties was violated to the prejudice of the relator.

A more important question arises upon the subject of the owner-ship of the premises.    The claim of the town of Oyster Bay is that all the lands applied for are within the limits of Hempstead Harbor, and that Hempstead Harbor—at least the eastern part of it, including the lands in question—is within the bounds of a tract of land granted by Gov. Andros by patent dated September 29, 1677, to Henry Town-send and others as patentees, on behalf of the town.    In this pat-ent there is first a recital as follows:

"Whereas there is a certain town in the north riding of Yorkshire upon Long Island commonly called and known by the name of 'Oyster Bay,' situated, lying, and being on the north side of the said island toward the sound, having a certain tract of land thereunto belonging, the east bounds whereof being at the head of the Cold spring, and so to range upon the southward line from the sound, or North sea, to the South sea across the island to the south east bounds of their south meadows, at a certain river called by the Indians 'Narrasketuck'; thence running along the seacoast westerly to another certain river called 'Arrasquaung'; then northerly to the eastward extent of the great plains, when the line divided Hemp-stead and Robert Williams' bounds; from thence stretching westerly along the mid-dle of the said plains, till it bears south from the said Robert Williams' marked tree at the point of trees called 'Cantiage'; then on a north line to the said marked tree; then on a northwest line, somewhat westerly, to the head of Hempstead Harbor, on the east side so to sound; and from thence easterly along the sound to the afore-mentioned north and south line which runs across the island by the Cold spring aforesaid; bounded on the north by the sound, on the east by Huntington limits, on the south part by the sea and part by Hempstead limits, and on the west by the bounds of Hempstead aforesaid, including all the necks of land and islands within the aforesaid described bounds and limits."

Then follows the grant to the patentees of—

"All the aforementioned tract of land within the said bounds, with the islands and necks of land as aforesaid, together with all the woods and plains, meadows, pas-tures, swamps, marshes, waters, lakes, rivers, fishing, hawking, hunting, and fowl-ing, and all other profits, commodities, emoluments, and hereditaments to the said town tract of land and premises within the limits and bounds aforementioned de-scribed belonging or in any wise appertaining."

The remonstrants also put in evidence a patent of the town of Hempstead, dated April 17, 1685, from Gov. Dongan to John Sea-man and others as patentees, for the benefit of that town.    This town is westerly of the town of Oyster Bay.    The description in the patent, after proceeding on the west side to the sound, or East river, proceeds as follows:

"And so round the points of the necks till it comes to Hempstead Harbor, and so up the harbor to a certain barren sand beach, and from thence up a direct line till it comes to a marked tree on the east side of Cantiagge Point, and from thence a south line to the middle of the plains, and from thence a due east line to the utmost extent of the Great Plains, and from thence upon a straight line to a certain tree marked in a neck called 'Maskachoung,' and so from thence up a due south line to the South sea (and the said South sea is to be the south bounds from the east line to the west line, and the sound or East river to be the northerly bounds), as ac-cording to several deeds purchased from Indian owners, and the patent from the Dutch governor, William Kieft, relation thereto being had doth more fully and at large appear."

It is not claimed that the town, under the Andros patent, had any title to lands on the sound beyond the ordinary high-water mark. The claim is that Hempstead Harbor is not a part of the sound, and that the lands in question are in the harbor.    It is not clear that the

lands are within the bounds of the harbor. Where the line is between the harbor and the sound does not appear, except as it may be inferred from the maps put in evidence on either side. According to the maps of the remonstrants, the lands are in the harbor; according to the maps of the applicants, the lands are in the sound. The harbor is at the northwesterly border of the town of Oyster Bay and the northeasterly border of the town of Hempstead (now North Hempstead). The sides of the harbor or bay, proceeding towards the sound, diverge, and where the sound may be deemed to commence is not made clear. Assuming, however, that the lands are within the harbor, the question then is whether the Andros patent includes them. We are referred to a number of cases where there has been litigation over the title or use of lands under water in towns on Long Island (Rogers v. Jones, 1 Wend. 237; Trustees v. Strong, 60 N. Y. 59; Robins v. Ackerly, 91 N. Y. 98; Hand v. Newton, 92 N. Y. 88; Town of North Hempstead v. Thompson, 115 N. Y. 635, 21 N. E. 1116; Id., 8 N. Y. St. Rep. 901; Trustees of Town of South Hampton v. Mecox Bay Oyster Co., 116 N. Y. 1, 22 N. E. 387; Lowndes v. Town of Huntington, 153 U. S. 1, 14 Sup. Ct. 758), but none reach the question here presented, or relate to the title of lands in Hempstead Harbor.

We may assume that if the lands are within the town patent, the state had no right to interfere. The argument of the remonstrants is based mainly on that part of the general description in the patent which bounds the town "on the north by the sound, * * * on the west by the bounds of Hempstead aforesaid." It is said that the eastern boundary of Hempstead, as stated in the Dongan patent, does not include any of the harbor, and that, therefore, the western boundary of Oyster Bay includes the whole. The Dongan patent was given eight years after the Andros patent; and what the description was in the Kieft patent, referred to in the Dongan patent, does not appear. The Kieft patent was given in 1644. Town of North Hempstead v. Town of Hempstead, 2 Wend. 110; 1 Brodhead, Hist. N. Y. 388. In the particular description in the Andros patent the westerly line goes "to the head of Hempstead Harbor, on the east side, so to sound." This would only go to high-water mark along the east side of the harbor, and would exclude the harbor and the land in controversy. The general rule is that, if there is a particular description and a general one, the particular one must prevail. Tied. Real Prop. § 829; Burnett v. Wadsworth, 57 N. Y. 634; Sherman v. McKeon, 38 N. Y. 272. The intention is made manifest by the particular statement, and in the present case would seem to be quite definite. The general reference to the boundary on the west "by the bounds of Hempstead aforesaid" may be construed to refer only to the bounds of Hempstead already therein specified, and, as the boundary of Hempstead on the harbor is not specified, there could be no inference of any intention to change or vary the particular boundary on the harbor or bay as previously stated in the patent. Nor is it probable that the control of the entire bay would be given to one town. It is more probable, in view of the size and location of the harbor, that the design was not to give it to either. Some of

the early patents include in terms the bays, but that is not the case here.

The action of the board of supervisors of Queens county, pursuant to chapter 361 of the Laws of 1870, in fixing the center of the harbor as the boundary between the town of North Hempstead and Oyster Bay (chapter 600, Laws 1880), would not operate to place ownership in either town of any lands it did not before possess. It is hardly claimed to have that effect.

The determination of the commissioners was that the remonstrants failed to prove that the town of Oyster Bay owned the lands in question. We discover no good reason for disturbing this conclusion. Presumptively, the lands under tide water belonged to the state, and the commissioners had a right to act on this presumption, in the absence of proof to the contrary. The commissioners or their predecessors had so acted previously in making grants in the same locality. There was no question as to the ownership by the applicants of the adjacent uplands.

It is further claimed that no sufficient necessity is apparent for granting the applications, or, if at all, not to the extent claimed, and that the rights of the public will be improperly interfered with. By the statute (section 70, Public Lands Law, as amended by chapter 208, Laws 1895) grants are authorized of land under water adjacent to and surrounding Long Island, but not beyond any permanent exterior water line established by law. It is provided that the commissioners of the land office may grant, in perpetuity or otherwise, to the owners of the lands adjacent, "to promote the commerce of this state, or for the purpose of beneficial enjoyment thereof by such owners, or for agricultural purposes, so much of said lands under water as they deem necessary for that purpose." The commissioners are evidently clothed with a discretion in the matter. In People v. Jones, 112 N. Y. 598, 20 N. E. 577, it was assumed that this discretion as to whether a grant shall be made or not, assuming they had a right to act, and dealt with the proper party, may not be controlled. The determinations of inferior jurisdictions in matters within that jurisdiction which are confided to their discretion are not reviewable. People v. Board of Fire Com'rs, 100 N. Y. 82, 2 N. E. 613. The applicants here sought the grants for the purpose of the beneficial enjoyment of their adjacent uplands, in order to obtain dockage or anchorage or harbor facilities, or protect their uplands from the violence of the sea. The proofs before the commissioners presented the situation, and their judgment as to the necessity or the extent of the grants should not be interfered with. It is not claimed that they go beyond any established exterior line.

There was conflicting evidence as to the extent that the occupation of baymen would be disturbed, or the right of the public to obtain clams or oysters. The legislature, in authorizing such grants, did not make the authority of the commissioners depend upon whether the lands were used by the public. Assuming, however, that the circumstances under which the public are using the property should be considered by the commissioners, it was a matter that affected their discretion, and we cannot say, as matter of law, that the inter-

ests of the public required the denial of the applications. The commissioners, in their return, say that the granting of the applications was not to the injury or prejudice of the remonstrants, or any person whatever. The general rule is that the title of the state to the seacoast and the shores of tidal rivers cannot be alienated except for some public purpose, or some reasonable use which can fairly be said to be for the public benefit. Coxe v. State, 144 N. Y. 396, 39 N. E. 400; Illinois Cent. R. Co. v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110. The right, however, to make grants to the owners of adjacent uplands, either for beneficial enjoyment or for commercial purposes, has long been recognized. Coxe v. State, 144 N. Y., at page 407, 39 N. E., at page 402; Trustees v. Strong, 60 N. Y. 70.

It is suggested that the commissioners, in accepting, on the subject of the necessity of the grant, the affidavit of one of the assessors of the town, instead of two, as required by their rules, acted improperly, and therefore a good reason is presented for setting aside their determination. No statutory requirement was violated. The rules which they had themselves established they could waive or modify. We cannot say, as claimed by the remonstrants, that the commissioners did not act in good faith. It seems to be conceded that they had a discretion in the matter. We cannot say that they have improperly exercised it. The town itself claimed the whole property, and its officers might well hesitate to aid parties who, as the body of the town claimed, were seeking to obtain property or rights that belonged to the town. We fail to find any tenable ground for setting aside the determinations of the commissioners. They should therefore be confirmed.

Determination of commissioners confirmed, with costs. Similar order in the other cases. All concur.